**Gabrielle S. GANG, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 88 C 3136.

United States District Court, N.D. Illinois, E.D.

Jan. 21, 1992.

---

David A. McGuire, Lane M. Gensburg, Stone, McGuire & Benjamin, Chicago, Ill., for plaintiff.

Frederick H. Branding, Johnson & Bell, Ltd., Chicago, Ill., Philip L. Sbarbaro, Noreene C. Stehlik, U.S. Dept. of Justice, Tax Div./Sp. Litigation, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

ILANA DIAMOND ROVNER, District Judge.

### I. INTRODUCTION

This case presents a novel question of federal tax law involving the effective date of a congressional amendment to a statute that penalizes the setting up of a fraudulent tax shelter. On August 31, 1987, the Internal Revenue Service ("IRS" or "Commissioner") assessed a $391,500 penalty against plaintiff Gabrielle Gang ("Gang") pursuant to 26 U.S.C. § 6700 for promoting an abusive tax shelter. Subsequently, Gang commenced this refund suit in federal court raising numerous issues regarding the penalty.

Section 6700 of the Internal Revenue Code [1] prohibits the promotion of abusive tax shelters. A person who "organizes" or "participates in the sale of any interest in" any "plan or arrangement" and who makes

---

1. At the time Gang promoted the fraudulent tax shelter, 26 U.S.C. § 6700, in pertinent part, provided:

Sec. 6700. **Promoting abusive tax shelters, etc.**

**(a) Imposition of penalty.**—Any person who—

(1)(A) organizes (or assists in the organization of)—

(i) a partnership or other entity,

(ii) any investment plan or arrangement, or

(iii) any other plan or arrangement, or

(B) participates in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes (in connection with such organization or sale)—

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

(B) a gross valuation overstatement as to any material matter,

shall pay a penalty equal to the greater of $1,000 or 10 percent of the gross income derived or to be derived by such person from such activity.

a fraudulent statement concerning the tax benefits available under the plan or makes a "gross valuation overstatement" concerning the property or services offered to investors under the plan, is liable for a penalty "equal to the greater of $1000 or 10 percent of the gross income derived or to be derived ... from such activity." Section 6700 (1982). Effective July 19, 1984, Congress amended this provision to substitute "20 percent" for "10 percent." *See* Tax Reform Act of 1984, Pub.L. No. 98–369, § 143(a), 98 Stat. 494, 682 (1984).

Gang has now moved for summary judgment on one of the many issues she has raised in her complaint: whether an amendment to section 6700, which increased the penalty for selling fraudulent tax shelters from 10% to 20% of gross income, applies to her case. The IRS, in responding to Gang's motion, filed a cross-motion for partial summary judgment. In her reply to the IRS, Gang has conceded liability for violating the statute. (Plaintiff's Reply in Support of Motion for Summary Judgment at 1 n. 1).

## II. FACTS

The facts of this case, which are complicated by a separate—and now completed—parallel proceeding in federal court, are not in dispute. After Gang filed her statement of uncontested facts, the IRS adopted her statement as its own. Gang is the president and sole owner of Datamatic Services, Inc. ("Datamatic") and has been since 1981. In the related case before Judge Nicholas J. Bua, a federal jury found, in 1987, that Datamatic was liable under § 6700 for promoting the same fraudulent tax shelter at issue in this case. In *Datamatic Services, Inc. v. United States*, 909 F.2d 1029 (7th Cir.1990), a decision which affirmed the lower court decision, the Seventh Circuit stated the following facts:

> In April 1982, Datamatic agreed to buy for $1,200 (plus other costs for related services) from the Jones Medical Instrument Company (Jones Medical) machines called Tiffenaires, which are used by physicians to test the condition of a patient's lungs. Datamatic then offered

the machines for sale to investors at $35,000 each. It drafted and distributed booklets to promote the sale, indicating that an investor could earn substantial income by buying the machine and then leasing it to a physician. The booklets also indicated that an investor could recover several times his cash investment through income tax benefits, in the form of investment tax credits, depreciation, and other deductions.

> Datamatic sold 250 of the machines at a price of $35,000 each. Typically, an investor made a cash down payment and signed a short-term note to Datamatic, which together accounted for $6,250. A five-year note evidenced the remaining $28,750. Minimum annual installments of $2,600 (approximating the annual interest) were to be paid out of the investor's net leasing receipts. Each purchaser was to pay Datamatic an additional one-time service fee of $1,750.

*Id.*, 909 F.2d at 1030–1031. Datamatic sold the last Tiffenaires in December 1983, but continued receiving income on the sales through 1990.

In 1986, the IRS assessed Datamatic a penalty pursuant to § 6700 based on Datamatic's promotion and sale of the Tiffenaires. The IRS determined Datamatic's penalty to be 10% of the gross income derived from the sale of Tiffenaires, or $391,500. The IRS denied Datamatic's claim for refund and Datamatic brought suit in federal district court. After a trial, the jury imposed a penalty of $400,000, which Judge Bua reduced to $391,500.

At the time of trial, the IRS also assessed a penalty against Gang personally in the amount of $391,500 for the same tax shelter. Like Datamatic, Gang paid 15% of the assessment ($58,725), as required by 26 U.S.C. § 6703(c)(1), and filed an administrative claim for refund. The claim was denied. She then filed suit in district court for a refund. She continued to receive income from the sale of the Tiffenaires in the form of wages from Datamatic through 1990. The parties have stipulated that Gang earned $501,486.46 in gross income over eight years from the sales.

Gang argues that the penalty rate should be 10% of $501,486.46, because she promoted the fraudulent tax shelter in 1982 and 1983 when § 6700 penalized such activity at 10%. At this percentage, Gang would owe the IRS $50,148.65, plus interest and additional credits to which Gang is entitled. If this is the case, the parties agree that Gang is now entitled to a refund of $8,576.35 from the IRS, given that she paid $58,725 in order to bring this suit.

The IRS argues that a penalty of 10% should be used with respect to income earned by Gang before July 19, 1984—the effective date of the amendment to § 6700 which increased the penalty rate from 10% to 20%—and 20% with respect to income earned by Gang on or after July 19, 1984. Under this calculation, Gang's penalty is $92,180.94, plus interest and less additional credits to which she is entitled. If this is the correct amount, the parties agree that Gang still owes the IRS $33,455.94.

### III. ANALYSIS

Summary judgment is properly granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Any doubts about the sufficiency of the evidence should be resolved in favor of the non-moving party. *Puckett v. Soo Line R. Co.*, 897 F.2d 1423, 1425 (7th Cir.1990). Because the parties agree on the facts of this case, no material issues of fact remain. In the absence of any such issues, the Court determines whether the moving party is entitled to judgment as a matter of law. *Rizzo v. Caterpillar, Inc.*, 914 F.2d 1003, 1006 (7th Cir.1990).

#### A. Language of § 6700

■ The starting point in every case involving construction of a statute is the language itself. *Ardestani v. I.N.S.*, —— U.S. ——, 112 S.Ct. 515, 519, 116 L.Ed.2d 496 (1991). When Congress enacted § 6700 on September 3, 1982, it provided that any person who promotes abusive tax shelters "shall pay a penalty equal to the greater of $1,000 or 10 percent of the gross income derived or to be derived by such person from such activity." S.Rep. No. 494, 97th Cong., 2d Sess. *reprinted in* 1982 U.S.Code Cong. & Admin.News 781, 1014. On July 18, 1984, Congress amended this provision to substitute "20 percent" for "10 percent." H.R.Rep. No. 98–432, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin.News 697, 1008–09. "The amendments made by this section shall take effect on the day after the date of enactment of this Act." Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 143(c), 98 Stat. 494, 682 (1984). The language of this statute and the amendment is clear, straightforward and unambiguous. Effective July 19, 1984, Congress directed that those who, like Gang, have promoted abusive tax shelters "shall pay ... 20% of the gross income *derived* ... from such activity." (Emphasis added).

Gang argues that this interpretation of the statute amounts to an illegal retroactive application of the amendment. However, in response, the IRS points out that Gang is being penalized only for "activity"—the sale of Tiffenaires—that took place after the effective date of the original § 6700 on September 3, 1982. She therefore had notice that this "activity" was illegal. The penalty is not applied retroactively, because, after the amendment on July 18, 1984, Gang was on notice that any future income she "derived" from that fraudulent tax shelter would be penalized at a rate of 20%. Therefore, the application of the 20% penalty in this case is prospective only. The Court notes that even with a penalty of 20%, Gang will make a tidy profit of over $400,000 from her fraudulent activities.

■ Gang also argues that the legislative history from both the 1984 and 1989 amendments shows that Congress intended

to penalize at 20% a promoter's "activity" only if the activity takes place after the effective date of the amendment. Yet, this Court looks beyond the express language of a statute only where that statutory language is ambiguous or where a literal interpretation would lead to an absurd result or thwart the purpose of the overall statutory scheme. *United States v. Real Estate Known as 916 Douglas Ave.*, 903 F.2d 490, 492 (7th Cir.1990). Because the statutory language is clear, the Court need not review the legislative history. But even if the Court considers that history, the strong presumption that the plain language of a statute expresses congressional intent is rebutted only in rare and exceptional circumstances, when a contrary legislative intent is clearly expressed. *Ardestani*, 112 S.Ct. at 520 (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987); *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)). In this case, the legislative history does not overcome the strong presumption that the legislative purpose is expressed by the ordinary meaning of the words used. *See American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962).

The Court is unable to identify *any* conclusive statement in the 1984 legislative history regarding prospective application of the 1984 amendment. The legislative history states simply:

> The attention of the committee has been drawn to evidence that the 10–percent enacted in TEFRA is inadequate in amount since promoters of tax shelters operate on a large margin.

The bill increases the penalty for promoting abusive tax shelters to the greater of 20 percent of the gross income derived, or to be derived, from the activity, or $1,000. The committee did not increase the $1,000 penalty because, as originally enacted, the $1,000 was intended to be a minimum penalty on small promoters who derive little income from the deals they promote.

H.R.Rep. No. 432, 98th Cong., 2d Sess. 1357–58, *reprinted in* 1984 U.S.Code Cong. & Admin.News 697, 1009.[2] The legislative history from the 1984 amendment does not contradict the plain meaning of the statute.

Congress clearly understood how to make an amendment to § 6700 prospective only and did so in a subsequent amendment in 1989. Up to that time, the federal courts had been split as to whether the $1,000 alternative penalty should be assessed against a tax shelter promoter for each sale or organizational activity, or whether this amount was a minimal penalty to be assessed only if 10%—later 20%—of the gross income amounted to less than $1,000. *See Agbanc, Ltd. v. United States*, 707 F.Supp. 423, 428 (D.Ariz.1988) (collecting cases). Congress amended § 6700 to resolve this split in authority. Section 6700 now provides that promoters of abusive tax shelters "shall pay, with respect to each activity described in paragraph (1), a penalty equal to $1,000 or, if the person establishes that it is lesser, 100 percent of the gross income derived (or to be derived) by such person from such activity...." Congress made these amendments apply only to "activities after December 31, 1989." P.L. 101–239, § 7734(b). Accordingly, the 1989 amendment applies only to income

---

**2.** An introduction to the Deficit Reduction Act of 1984 gives some general insight into the enormous problem members of the Congress perceived with tax shelters, but is unenlightening on the question of prospective application of the specific amendment to § 6700.

The committee believes that the proliferation of tax shelters has seriously eroded the tax base and has adversely affected the efficiency and equity of the tax system. The increase in tax shelter activity has aggravated the nation's deficit problem, particularly in

the case of "abusive" tax shelters where the tax write-offs are several times larger than the equity investment. The proliferation of tax sheltered investments shifts the tax burden to those taxpayers who do not or cannot participate in such investments, and the organization and promotion of tax shelters diverts thousands of skilled professionals from more productive activities....

H.R.Rep. No. 432, 98th Cong., 2d Sess. 1097, *reprinted in* 1984 U.S.Code Cong. & Admin.News 697, 773.

received from sales or organizational activity engaged in after December 31, 1989.

Gang argues that this provision helps her argument because views of a Congress subsequent to the Congress that enacted § 6700 are entitled to significant weight when the precise intent of the enacting Congress is obscure. (Plaintiff's Motion at 6, citing *Gates v. United States*, 874 F.2d 584, 587 (8th Cir.1989)). In fact, just the opposite is true in this case. Unlike the 1989 enacting legislation, the 1984 enacting legislation did not mention "activities," and Congress gave no indication that the 1989 enacting legislation was clarifying the effective date language in the 1984 enacting legislation. The 1989 effective date shows only that Congress knew how to craft a prospective statute when it so desired. By implication, Congress chose not to make the 1984 amendment prospective only. *See United States v. Poff*, 926 F.2d 588, 591 (7th Cir.) (*en banc*), *cert. denied*, — U.S. ——, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991) (a choice of different words reflects an intent to say something different); *Zabielski v. Montgomery Ward & Co.*, 919 F.2d 1276, 1279 (7th Cir.1990); *see also United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960) (views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one).

Gang seeks the benefit of a principle of statutory interpretation that would require the resolution of ambiguities in penalty statutes in favor of lenity. *Busic v. United States*, 446 U.S. 398, 406, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1980); *United States v. Keller*, 730 F.Supp. 151, 158 (N.D.Ill. 1990). The rule of lenity applies only in cases in which the statutory language and the legislative history is ambiguous. *Id.* Although the legislative history is not particularly helpful, the statutory language regarding the effective date is clear. Accordingly, this rule has no application to this case.

Gang cites to several cases involving the dispute over whether the $1,000 or 10% penalty apply, which Congress resolved by amendment in 1989. *Planned Investments, Inc. v. United States*, 881 F.2d 340

(6th Cir.1989); *Spriggs v. United States*, 660 F.Supp. 789 (E.D.Va.1987), *aff'd by unpublished opinion*, 850 F.2d 690 (4th Cir. 1988); *In re Tax Refund Litigation*, 766 F.Supp. 1248 (E.D.N.Y.1991). According to Gang, these cases show that, in resolving this dispute, both the courts and the IRS focused on the year in which the promoter engaged in the fraudulent promoting activity, and not the year in which the promoter derived the income from the activity. This may be true, but none of these cases involve a discussion of whether the 10% or 20% penalty apply. As such, they have little relevance. For example in *Planned Investments*, a case disputing whether the IRS had sent the proper notice to a taxpayer, the court stated in a footnote that "[t]he 1984 amendment's [20%] penalty is concededly inapplicable to [the taxpayer's] 1982 conduct." 881 F.2d at 342 n. 1. This was the case because the taxpayer had promoted a fraudulent tax shelter in 1982 and stopped deriving income from the tax shelter by November 1983, well before the 1984 amendment. *Id.*, at 341. *See also Hersch v. United States*, 685 F.Supp. 325 (E.D.N.Y.1988). In two cases the taxpayer promoted a tax shelter in 1982 and received income in 1984, but in neither case was it clear—or relevant to the discussion—that the income was received after the July 18, 1984 amendment. *See In re Tax Refund Litigation*, 766 F.Supp. at 1252 and n. 1; *Spriggs v. United States*, 660 F.Supp. at 790.

### B. Collateral Estoppel

Gang argues that the IRS is estopped from arguing that the 20% penalty applies because in *Datamatic Services*, which involved the same fraudulent tax shelter as this case, the IRS sought only a 10% penalty. For proof, Gang cites the testimony of IRS agent Steven Pischak in the *Datamatic Services* trial, who testified that under the law, the Datamatic penalty should be "calculated at 10 percent of the gross income that is received or to be received...." In addition, Gang notes that the IRS proffered a jury instruction stating: "[u]nder Section 6700 of the Code this penalty shall equal ten percent of the gross

income derived or to be derived ... from such organization or sale...."

 Collateral estoppel applies, precluding relitigation of a question, only if the question was actually adjudicated and the adjudication was necessary to the judgment. *Brown v. Felsen*, 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 2213 n. 10, 60 L.Ed.2d 767 (1979); *Truck Insurance Exchange v. Ashland Oil, Inc.*, 951 F.2d 787, 792 (7th Cir.1992). In other words, a question must be both litigated and decided for collateral estoppel to bar its relitigation. *Id.* "The first requirement will usually be satisfied merely by the designation of the question as one for trial (for example by being listed on the pretrial order as an issue to be tried)." *Id.*

 The pretrial order in *Datamatic Services* lists as only one contested issue of law: "whether the activities engaged in by the plaintiff constitute a violation of Section 6700(a)(1) and (2)(B) of the Internal Revenue Code." (IRS's Brief, Exhibit 1). Accordingly, the parties in *Datamatic Services* litigated only the question of liability under § 6700 and not the percentage of the penalty. Consequently collateral estoppel has no application to this case.

*C. Ex Post Facto*

 Finally, Gang argues that applying the 20% penalty in § 6700 violates Article I, Section 9 of the Constitution ("No bill of Attainer or *ex post facto* Law shall be passed."). Applying the 1984 amendment of § 6700 to Gang does not violate the *ex post facto* clause. This is a civil, not a criminal case. *Collins v. Youngblood*, —— U.S. ——, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990); *Harisiades v. Shaughnessy*, 342 U.S. 580, 594–95, 72 S.Ct. 512, 521–22, 96 L.Ed. 586 (1952); *Helvering v. Mitchell*, 303 U.S. 391, 401, 404–05, 58 S.Ct. 630, 635–36, 82 L.Ed. 917 (1938) (upholding, as a civil penalty, a 50% additional tax imposed where payment was deficient due to intentional fraud); *DeMartino v. Commissioner*, 862 F.2d 400, 409 (2nd Cir.1988) (upholding, as a civil penalty, a tax penalty under 26 U.S.C. § 6621 for business transactions that are shams). The Court rejects the language to the contrary—without citation or discussion—in one § 6700 tax case, *Weir v. United States*, 716 F.Supp. 574, 581 (N.D.Ala.1989). In addition, the taxpayer in *Weir* both set up and received all the income derived from the fraudulent tax shelter prior to the 1984 amendment, and to that extent, the case is factually distinguishable from the instant case. A 20% penalty is simply not so punitive as to be criminal either in purpose or effect. *See United States v. Ward*, 448 U.S. 242, 248–49, 100 S.Ct. 2636, 2641–42, 65 L.Ed.2d 742 (1980).

## IV. CONCLUSION

The Court holds that under 26 U.S.C. § 6700 the gross income that Gang "derived" from her fraudulent tax shelter after July 18, 1984 must be taxed at 20%. Gang's motion for partial summary judgment is denied. The IRS's cross-motion for partial summary judgment is granted.